# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| METRO STORAGE INTERNATIONAL LLC, a Delaware limited liability company, METRO STORAGE LATAM LLC, a Delaware limited liability company, MSI MANAGER LLC, a Delaware limited liability company, LATAM MANAGER LLC, a Delaware limited liability company, MATTHEW M. NAGEL, AS TRUSTEE OF THE MATTHEW M. NAGEL REVOCABLE TRUST DATED JULY 27, 2001, AS AMENDED, and K. BLAIR NAGEL, AS TRUSTEE OF THE K. BLAIR NAGEL REVOCABLE TRUST DATED JULY 30, 2003, AS AMENDED, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES A. HARRON, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 2018-0937-JTL |

## MEMORANDUM OPINION

Date Submitted: May 7, 2019
Date Decided: July 19, 2019

David C. McBride, Emily V. Burton, Lauren Dunkle Fortunato, YOUNG CONAWAY STARGATT & TAYLOR, LLP., Wilmington, Delaware; Harold C. Hirschman, Leah R. Bruno, Jacqueline A. Giannini, DENTONS US, LLP, Chicago, Illinois; *Counsel for Plaintiffs.*

E. Chaney Hall, Kasey H. DeSantis, FOX ROTHSCHILD LLP, Wilmington, Delaware; Jeffrey L. Widman, FOX ROTHSCHILD LLP, Chicago, Illinois; *Counsel for Defendant.*

**LASTER, V.C.**

Defendant James Harron served as president of plaintiffs Metro Storage International LLC ("International") and Metro Storage LATAM LLC ("LATAM"; together, the "Companies"). After Harron resigned, his former employers discovered that he had been pursuing personal business ventures on the side. The Companies filed suit, joined by the other plaintiffs. They contend that Harron violated the Companies' LLC agreements, breached his fiduciary duties, and violated the Stored Communications Act. They also seek declarations that Harron defaulted on loans he received.

Harron moved to dismiss the complaint for lack of personal jurisdiction. The exercise of personal jurisdiction requires a valid means of serving process. The plaintiffs argue that they properly served Harron under the implied consent provision in the Delaware Limited Liability Company Act (the "LLC Act"), 6 *Del. C.* § 18-109(a), which establishes a mechanism for serving process on a manager of an LLC.

 For purposes of service, Section 18-109(a) defines the term "manager" as encompassing two categories of persons: first, a person formally named as a manager pursuant to the governing LLC agreement; and second, a person not formally named as a manager pursuant to the governing LLC agreement but who nevertheless "participates materially in the management of the limited liability company." 6 *Del. C.* § 18-109(a). This decision refers to the first category as a "formal manager" and the second category as an "acting manager."

The Companies were manager-managed LLCs, and their LLC agreements vested authority over their business and affairs in formal managers. Harron was not a formal

manager, but he was an acting manager. The record supports a reasonable inference that Harron participated materially in the Companies' management. As president, he managed their day-to-day operations. That conduct satisfies the plain language of the statute.

Harron argues that a greater showing is required. He asserts that to qualify as an acting manager, the person must have occupied a "control or decision-making role." He argues that any time an LLC agreement vests authority in a formal manager, another person cannot occupy a control or decision-making role, because the formal manager has that role. He further argues that when a person participates in management as an agent for another, the person's actions as an agent cannot support acting-manager status.

Based on these theories, Harron argues that the plaintiffs cannot serve him under Section 18-109(a). He contends that even though he served as president of the Companies and, in that capacity, managed their day-to-day operations, he never held a control or decision-making role because the LLC agreements designated formal managers, and he was merely their agent.

This decision analyzes the precedent on which Harron relies and traces the lines of reasoning to their origins. In each case, the archaeological effort uncovers a weak foundation, which subsequent decisions have built upon without shoring up. In each case, Harron's theories conflict with the LLC Act or with jurisdictional doctrines. This decision therefore rejects Harron's arguments.

The exercise of personal jurisdiction also must comply with the Due Process Clause of the Constitution of the United States. Harron has sufficient contacts with the State of Delaware to render this court's exercise of personal jurisdiction constitutionally

2

permissible. Harron's motion to dismiss for lack of personal jurisdiction is denied.

## I.      FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' complaint and the documents it incorporates by reference. Citations to exhibits ("Ex. —") refer to documents attached to the complaint. When considering a Rule 12(b)(2) motion, a court may consider affidavits relating to the jurisdictional issues, and this decision takes into account the affidavits that the parties submitted. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A.      Metro and Harron

Non-party Metro Storage LLC ("Metro") is one of the largest privately owned operators of self-storage facilities. Two brothers own Metro: plaintiff Matt Nagel, who serves as its chairman, and plaintiff Blair Nagel, who serves as its chief executive officer. The Nagel brothers are parties to this action solely as trustees of their respective trusts, which own member interests in the Companies. For simplicity, this decision refers to the Nagels using their first names.

In 2011, Harron approached Matt about developing self-storage facilities in Brazil. Matt liked the idea, and Harron began working with Metro to develop it. Later, the concept broadened to include pursuing opportunities throughout Latin America.

Harron took the lead in working with counsel and accountants to establish the necessary entities. He formulated the business objectives and strategy, and he negotiated a joint venture with a Brazilian company.

**B.      International**

Effective October 10, 2012, Harron, Matt, and Blair executed the LLC agreement for International (the "International Agreement"). It established a manager-managed governance structure for International and designated MSI Manager LLC as the formal manger. Matt and Blair owned and controlled MSI Manager.

As the LLC Act requires when establishing a manager-managed governance structure, the International Agreement contained a provision specifically empowering MSI Manager to manage the entity. Section 10.1 of the International Agreement stated:

> Except as hereinafter expressly provided the Manager shall have exclusive authority to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company, and the Members (as Members) shall have no right to vote upon or otherwise make any decisions relating to the operation of the Company except as may be otherwise expressly provided in this Agreement. The Manager shall have all the rights and powers of Manager [*sic*] as provided in the Act and as otherwise provided by law, subject to the express limits set forth herein. Any action taken by the Manager shall constitute the act of and serve to bind the Company; provided that the Manager agrees not to cause the Company to take any Unanimous Approval Action other than requiring Capital Contributions unless such Unanimous Approval Action shall have been approved by the Principals and, during the first two years after the date hereof, the Executive.

As is customary when establishing a manager-managed governance structure, the International Agreement contained a reciprocal provision confirming that the members did not have the ability to participate in management. Section 10.5 of the International Agreement stated:

> Except as may be otherwise expressly provided herein, the Members shall not participate in the management or control of the Company's business or transact any business for the Company, nor shall they have the power to act

4

for or bind the Company, all such powers being vested solely and exclusively in the Manager.

Under this structure, MSI Manager had the exclusive authority to manage International, and MSI Manager's actions would constitute the acts of and bind International, except that MSI Manager could not unilaterally take what Section 10.1 identified as "Unanimous Approval Actions." Those actions required the prior approval of "the Principals," defined as Matt and Blair, and (for the first two years) the "Executive," defined as Harron. In Section 10.3, the International Agreement identified nineteen "Unanimous Approval Actions." They generally reflected major actions that International might take, such as dissolving or merging, terminating or replacing the manager, admitting a new member, or amending the agreement. But several of the Unanimous Approval Actions involved decisions that could be expected to arise with some frequency for an entity planning to develop self-storage facilities, such as

> (iii) borrowing money or guaranteeing the debt of any other Person;
>
> (iv) encumbering any of the Company's assets; . . . [or]
>
> (vi) directly or indirectly acquiring any real property or entering into any binding agreement to directly or indirectly acquire any real property.

For the first two years of International's existence, Harron had a veto over these and other Unanimous Approval Actions.

The International Agreement authorized the Company to have officers. Section 10.7 stated:

> The Company may have officers (each an "Officer") to exercise such power and perform such duties as shall be determined from time to time by the Manager. The Officers may include a Chairman, a Chief Executive Officer,

a President, a Chief Operating Officer, a Secretary a [*sic*] Treasurer and one or more Vice Presidents, Executive Vice Presidents, Assistant Secretaries and Assistant Treasurers. . . . The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Officers taken in accordance with such powers shall bind the Company. However, no Officer shall execute any agreement by or on behalf of the Company, or any Metro International Entity, relating to (i) the acquisition or disposition of real property, (ii) the borrowing of money or any guarantees relating to the borrowing of money, or (iii) any other matter pursuant to which the Company, or any Metro International Entity would be expected to expend or receive $25,000 or more unless in any such case the applicable action shall have been approved in writing by the Manager.

The International Agreement designated Matt as Chairman, Blair as CEO, and Harron as President.

Notably, Section 10.7 recognized that "the actions of the Officers taken in accordance with [their] powers shall bind the Company." But Section 10.7 contained three exceptions when an officer could not act without the written approval of MSI Manager: (i) acquiring real property, (ii) borrowing money or providing a guarantee, or (iii) any other matter involving more than $25,000. The first two exceptions also qualify as Unanimous Approval Actions that Harron could veto during the first two years of International's existence.

## C.     Harron Runs International.

As president, Harron ran International's day-to-day operations. His responsibilities included screening opportunities, negotiating joint venture agreements, coordinating meetings with third parties, analyzing whether to make capital calls, overseeing joint venture staff, interacting with joint venture partners, and monitoring the company's

performance. He was quite literally the face of the business, and International's website identified him as the point of contact for any potential investor or business partner. Harron's resume represents that he "led all elements of international investment."

Although MSI Manager formally had authority to manage International, its principals, Matt and Blair, were not directly involved in International's day-to-day operations. Harron only sought approval from Matt and Blair for major decisions, such as borrowing money or entering into joint venture agreements. By seeking these approvals, Harron complied with the last sentence of Section 10.7 of the International Agreement, which limited his authority as president to acquire or dispose of real property, to borrow money or provide guarantees, or to commit International or its affiliates to spend or receive $25,000 or more.

## D. LATAM

The International Agreement implied that International would be the vehicle through which Metro's principals would pursue all of their international operations. But in 2017, Matt, Blair, and Harron formed a separate entity—LATAM—to pursue opportunities in Latin America outside of Brazil.

LATAM's internal affairs are governed by a limited liability company agreement dated March 28, 2017 (the "LATAM Agreement"). The terms of the LATAM Agreement and the governance structure it created largely track the International Agreement.

Like the International Agreement, the LATAM Agreement established a manager-managed governance structure, and it designated LATAM Manager LLC as the formal manager. Like MSI Manager, LATAM Manager was owned and controlled by Matt and

7

Blair. As in the International Agreement, the LATAM Agreement (i) empowered the manager to manage LATAM, (ii) prohibited members from participating in management, and (iii) identified a list of Unanimous Approval Actions that required unanimous approval from Matt, Blair, and Harron. The LATAM Agreement also authorized LATAM Manager to appoint officers and empower them to act on behalf of the Company, subject to the same limitations found in the International Agreement. Like the International Agreement, the LATAM Agreement designated Matt as Chairman, Blair as CEO, and Harron as President.

As with International, Harron ran LATAM's day-to-day operations. Among other things, he led the creation of a joint venture with Central America's leading operator of self-storage facilities.

### E.    Harron Resigns.

In 2018, Harron resigned from Metro and its affiliates. After Harron's departure, Matt and Blair uncovered evidence that Harron had been pursuing personal projects and investments in the storage industry while working for Metro and its affiliates. In December 2018, the plaintiffs filed this lawsuit against Harron.

The complaint in this action contains seven counts:

- Counts I and II contend that Harron breached the International and LATAM Agreements by misusing the Companies' confidential information to conduct business with third parties for his own personal benefit.

- Count III contends that Harron breached his fiduciary duties as an officer of the Companies by pursuing business opportunities for his own personal benefit.

- Count IV asserts that Harron violated the Stored Communications Act by using Metro's email servers and computer systems for unauthorized purposes and by attempting to delete emails and files from his Metro accounts before his departure.

8

- Counts V and VI seek declaratory judgments that the Companies have the right to repurchase Harron's member interests at no cost because of Harron's breaches of the International and LATAM Agreements.

- Count VII seeks a declaration that Harron defaulted on loans he received from the Companies to meet capital calls and that he must repay the amounts due after the Companies repurchase his member interests.

## II.     LEGAL ANALYSIS

Harron moved to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction. "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a method of serving process. Second, the defendant must have certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### A.     Service of Process

As their method of serving process, the plaintiffs rely on Section 18-109(a) of the LLC Act. In relevant part, it states:

> A manager . . . may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any

9

member of the limited liability company, whether or not the manager . . . is a manager . . . at the time suit is commenced.

A manager's . . . serving as such constitutes such person's consent to the appointment of the registered agent of the limited liability company (or, if there is none, the Secretary of State) as such person's agent upon whom service of process may be made as provided in this section.

6 *Del. C.* § 18-109(a) (formatting added).

Like other entity statutes that authorize service of process on members of the governing body of an entity or its officers, Section 18-109(a) only provides a basis for specific jurisdiction, not general jurisdiction. *See Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 885 n.39 (Del. Ch. 2009). The claim against the manager must therefore "involv[e] or relat[e] to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company." 6 *Del. C.* § 18-109(a). Harron does not dispute that dimension of the analysis.

Section 18-109(a) defines the term "manager" to encompass both formal managers and acting managers. It states:

As used in this subsection (a) and in subsections (b), (c) and (d) of this section, the term "manager" refers

(i) to a person who is a manager as defined in § 18-101(10) of this title and

(ii) to a person, whether or not a member of a limited liability company, who, although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company;

provided however, that the power to elect or otherwise select or to participate in the election or selection of a person to be a manager as defined in § 18-101(10) of this title shall not, by itself, constitute participation in the management of the limited liability company.

10

6 *Del. C.* § 18-109(a) (formatting added); *accord id.* § 18-110(c) (using same definition). The two-part manager definition in Section 18-109(a) reference Section 18-101(10), which defines a "manager" as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited lability company is formed." *Id.* § 18-101(10).

The first category of persons identified in Section 18-109(a)—formal managers—encompasses persons who have been officially named as managers in or designated pursuant to the entity's governing documents. The second category of persons—acting managers—encompasses other persons, not formally named as managers, who nevertheless "participate[] materially in the management of the limited liability company."

Under Section 18-109(a)(ii), a person can be served as an acting manager "whether or not a member of a limited liability company." But for the purpose of determining whether a person is an acting manager, "the power to elect or otherwise select or to participate in the election or selection of a person to be a [formal manager] shall not, by itself, constitute participation in the management of the limited liability company." This safe harbor confirms that a passive investor will not be treated as a manager simply because the investor enjoys the right to participate in the election of managers, which is a right that passive investors typically enjoy.

The plaintiffs contend that Harron was an acting manager under Section 18-109(a)(ii). They do not claim that Harron was a formal manager under Section 18-109(a)(i). They recognize that the International Agreement named MSI Manager as International's

11

formal manager and that the LATAM Agreement named LATAM Manager as LATAM's formal manager. To support their claim that Harron was an acting manager, they observe that Harron served as president of both International and LATAM and was responsible for managing their day-to-day operations. They arrive at the common-sense conclusion that given these roles and activities, Harron "participate[d] materially in the management of" International and LATAM.

In response, Harron argues that despite serving as president and managing the Companies' day-to-day operations, he did not "participate[] materially" in management. To reach this counterintuitive conclusion, he makes three arguments. First, he cites three decisions that have added a layer to the material-participation test by holding that persons are not amenable to service as acting managers unless they occupy a "control or decision-making role."[1] This decision describes this additional layer as the "control overlay."

Second, Harron notes that the decisions applying the control overlay have placed significant weight on the presence in the pertinent LLC agreement of a provision vesting a formal manager with authority to manage the LLC.[2] Each case reasoned that another person could not have occupied a "control or decision-making role" because the provision

---

[1] *See Wakley Ltd. v. Ensotran, LLC*, 2014 WL 1116968, at *5 (D. Del. Mar. 18, 2014); *CelestialRX Invs., LLC v. Krivulka*, 2019 WL 1396764, at *19 (Del. Ch. Mar. 27, 2019); *In re Dissolution of Arctic Ease, LLC*, 2016 WL 7174668, at *3 (Del. Ch. Dec. 9, 2016).

[2] *See Wakley*, 2014 WL 1116968, at *6; *CelestialRX*, 2019 WL 1396764, at *19; *Arctic Ease*, 2016 WL 7174668, at *5.

assigned that role to the formal manager. Under this line of reasoning, the presence of a formal manager forecloses acting-manager status, except possibly in a case where a person usurps the formal manager's role. This decision refers to this aspect of Harron's argument as the "formal manager designation."

Third, Harron notes that one of the decisions applying the control overlay reasoned that persons who participated in the management of an LLC while acting as agents for a member could not be served because they acted as agents. *See Wakley*, 2014 WL 1116968, at \*6. Under this approach, the agency relationship shields the agent from Section 18-109(a)(ii)'s reach, so this decision describes this aspect of Harron's argument as the "agency shield."

Adding these arguments together, Harron concludes he could not have participated materially in managing the Companies because that standard requires a "control or decision-making role." The complaint does not allege that Harron usurped the authority of the Companies' formal managers, so Harron views the formal manager designations as dispositive. The International and LATAM Agreements further provided that as president, Harron was subject to the authority of the Companies' formal managers, making him their agent and bringing the agency shield into play. Harron says he did not participate materially in the management of the Companies under these lines of authority, regardless of whether he actually managed the Companies.[3]

---

[3] *See* Dkt. 10 at 10 ("Where the company's operating agreement states that management and control of the company is vested solely in the manager, members of the

13

To determine whether the plaintiffs could serve Harron under Section 18-109(a)(ii), this decision first analyzes the plain language of the material-participation test. After concluding that Harron is subject to service under a plain-language analysis, this decision analyzes the control overlay, the implications of a formal manager designation, and the agency shield. Each line of reasoning rests on a weak foundation and leads to problematic results. Accordingly, this decision declines to follow those approaches.

### 1. Material Participation

Determining what is required to qualify as an acting manager under Section 18-109(a)(ii) presents a question of statutory interpretation. When interpreting a statute, the court's task is to "ascertain and give effect to the intent of the legislature." *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985). "Where the statute is unambiguous," the court "must adhere to the plain meaning of the statutory language." *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 286 (Del. 2016). To do so, a court

---

company's board of directors lack management control for jurisdictional purposes."); *id.* at 10–11 ("[I]ndividuals who are in charge of financial and commercial functions for a limited liability company and who act subject to the board's authority do not participate materially in the management of the company absent a 'control or decision-making role' in the company."); *id.* at 14 ("Although Harron had high-level duties with the companies, like the defendants in *Arctic Ease* and *Wakley*, his authority was always subject to that of the Manager of each company."); *id.* at 15 ("Harron's authority, however, was always subject to the approval and oversight of the manager of each company, which was solely owned by Matt and Blair."); Dkt. 20 at 10 ("Where the operating agreement expressly reserves control or decision-making authority for specifically identified individuals, such as the named manager or a management committee, other executives do not participate materially in management within the meaning of Section 109(a)(ii).").

14

starts with "the plain meaning of the words . . . ." *Rubrick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000). A statute "must be read as a whole in a manner that will promote its purposes." *Id.*

Section 18-109(a)(ii) permits a plaintiff to serve process on a person who "participates materially in the management of the limited liability company." The plain meaning of the word "participate" involves taking part in or playing a role in an activity or event.[4] When modifying the word "participate," the word "materially" introduces a level of significance. It requires meaningful participation, rather than minor participation.[5]

---

[4] *See, e.g.*, *Participation*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("**1.** The act of taking part in something, such as a partnership, a crime, or a trial. **2.** The right of an employee to receive part of a business's profits; profit-sharing."); *Participate*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("To receive or have a part or share of; to partake of; experience in common with others; to have or enjoy a part or share in common with others. To partake, as to 'participate' in a discussion, or in a pension or profit sharing plan. To take equal shares and proportions; to share or divide, as to participate in an estate. To take as tenants in common."); *Participate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/participate (last visited July 10, 2019) ("[T]o take part" or "to have a part or share in something."); *Participate*, Am. Heritage Dictionary English Language, https://ahdictionary.com/word/search.html?q=Participate (last visited July 10, 2019) ("To be active or involved in something; take part.").

[5] *See, e.g.*, *Material*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("**2.** Having some logical connection with the consequential facts <material evidence>. **3.** Of such a nature that knowledge of the item would affect a person's decision-making; significant; essential <material alteration of the document>."); *Material*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("Important; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is 'material.'"); *Material*, Merriam-Webster, https://www.merriam-webster.com/dictionary/material (last visited July 10, 2019) ("[H]aving real importance or great consequences."); *Material*, Am. Heritage Dictionary English Language, https://ahdictionary.com/word/search.html?q=Material (last visited July 10, 2019) ("Being

Before the introduction of the control overlay in 2013, this court twice applied the plain language of the material-participation test. In *Phillips v. Hove*, 2011 WL 4404034 (Del. Ch. Sept. 22, 2011), an LLC ("GnB") lacked a formal LLC agreement, and its two members failed to agree on anything other than the LLC Act's default member-managed governance structure. The two members implicitly consented to Hove, a third party, taking over as the president of GnB. Hove began running GnB's day-to-day operations and later filed a bankruptcy petition for GnB. The decision held that through these actions, Hove "participated materially in the management of GnB, thereby satisfying the requirements of Section 18-109(a) and consenting to suit in Delaware for breaches of his duties to GnB." *Id.* at *22. The *Phillips* decision supports the exercise of jurisdiction over Harron, who similarly acted as president of the Companies, ran their day-to-day operations, and took binding action on their behalf.

---

both relevant and consequential; crucial."); *see also, e.g.*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *85 (Del. Ch.) (explaining how transactional drafters qualify covenant compliance with the phrase "in all material respects" to prevent "small, *de minimis*, and nitpicky issues" from derailing a transaction), *aff'd on other grounds*, 2018 WL 6427137 (Del. Dec. 7, 2018) (ORDER); *id.* at *86 (cautioning that party could materially breach contractual covenant even if breach would not be severe enough to excuse performance under common-law principles governing material breach of contract); *cf. Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017) (analyzing whether breach of covenant "materially contribute[d] to the failure of [a] closing condition"); *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *24 (Del. Ch. Aug. 18, 2016) (describing factors for common-law analysis of material breach of contract).

In the *PT China* case, the defendant conceded that he was a manager of the LLCs in question. *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *5 & n.25 (Del. Ch. Feb. 26, 2010). The court nevertheless remarked that the complaint's allegations were sufficient to establish that the defendant participated materially in the management of the LLCs where he was responsible for developing investment opportunities, was named as a principal of the business and a "key man" in a joint venture agreement that the LLCs had entered, and where he would have led an investment program for the joint venture. *See id.* at *5 n.25. The *PT China* decision likewise supports the exercise of jurisdiction over Harron, who was responsible for developing all of the Companies' investment opportunities, was the key officer for both Companies, and oversaw their investment programs. *See also In re Mobilactive Media, LLC*, 2013 WL 297950, at *2, *30 (Del. Ch. Jan. 25, 2013) (exercising jurisdiction over entity that was acting manager of LLC where entity's subsidiary was 50% member of LLC, subsidiary lacked employees, and entity caused subsidiary to file petition for LLC's dissolution).

Moving beyond plain language, there is a paucity of authority addressing the concept of material participation. Research has not revealed any legislative history that might shed light on the phrase, and the principal Delaware treatise on the LLC Act describes the holdings of various cases without providing independent guidance on how the statute should operate. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.13[A] (2d ed. & Supp. 2018).

In the broader legal literature, the concept of material participation appears to arise most frequently under federal tax law, where the concept determines whether a taxpayer is

17

an active participant in a trade or business, as opposed to a passive investor, and hence the extent to which the taxpayer can claim deductions for certain business losses.[6] The concept also plays a role in determining whether the interest that a taxpayer owns in an entity taxable as a partnership either (i) has the characteristics of a general partner interest and hence obligates the taxpayer to pay self-employment tax on the taxpayer's share of business income or (ii) has the characteristics of a limited partner interest and hence does not obligate the taxpayer to pay self-employment tax.[7]

The LLC was originally invented through the combined efforts of sophisticated corporate lawyers and savvy tax practitioners. Together, they convinced the State of Wyoming to adopt the first LLC statute in 1977 with the goal of delivering a combination of limited liability and partnership tax treatment. In 1988, the Internal Revenue Service ruled that this previously obscure entity could indeed deliver both features. After the IRS ruling and with the LLC gaining in popularity, a group of Delaware lawyers under the auspices of the Council of the Corporation Law Section of the Delaware State Bar

---

[6] *See, e.g.*, 26 U.S.C. § 469; *Mattie K. Carter Tr. v. United States*, 256 F. Supp. 2d 536, 539–42 (N.D. Tex. 2003); *In re Frank Aragona Tr.*, 142 TC No. 9 (2014).

[7] *See, e.g.*, 26 U.S.C. § 1402; *Riether v. United States*, 919 F. Supp. 2d 1140, 1158–60 (D.N.M. 2012); Karen C. Burke, *Exploiting the Medicare Tax Loophole*, 21 Fla. Tax Rev. 570, 590–606 (2018) (describing "functional approach" to determining whether member in manager-managed LLC who is not designated as formal manager nevertheless is sufficiently active participant in business to acquire attributes of general partner and be subject to self-employment tax).

Association began drafting the LLC Act. In 1992, the LLC Act became law.[8] Given this history, it is logical that the LLC Act would use tax-related concepts like "material participation" consistently with the tax code, or at least would avoid using them inconsistently with the tax code.[9]

The applicable tests under federal tax law examine the extent of the taxpayer's involvement in the LLC's business based on a range of facts and circumstances. For example, for purposes of claiming certain losses, a taxpayer participates materially in a

---

[8] *See* Symonds & O'Toole, *supra*, § 1.01[A] & [B]; Susan Pace Hamill, *The Story of LLCs: Combining the Best Features of a Flawed Business Tax Structure*, in *Business Tax Stories*, 295 (Steven A. Bank & Kirk J. Stark eds., 2005). Ever since, tax planning has been a major driver of governance decisions involving LLCs. *See generally* John M. Cunningham & Vernon R. Proctor, *Drafting Delaware Limited Liability Company Agreements: Forms and Practice Manual* § 1.03[B] (2011) (titling section: "The Importance of Tax Knowledge in Handling Delaware LLC Formations"); *id.* § 15.02 (titling section: "The Importance of Tax Knowledge for Lawyers Engaged in LLC Formation Practice"); *id.* chs. 15–22 (eight chapters addressing implications of federal and state tax issues for LLC formation).

[9] *See Hazout*, 134 A.3d at 290 & n.58 (collecting authorities demonstrating that where legislature uses term with "well-settled legal meaning," it uses it in its "legal sense"); *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (looking to "both legal and non-legal definitions" of "to make" when interpreting statute of limitations); *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 2018 WL 3343495, at *12 (Del. Ch. July 9, 2018) ("When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."); *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) ("[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."); *cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 2005 WL 5775806, at *11 (Del. Ch. Aug. 22, 2005) (presuming use of words with "no accepted blackletter legal definition . . . was an implicit agreement by the parties to avoid the use of legal terms of art").

business if he or she works on a regular, continuous, and substantial basis in operations. 26 U.S.C. § 469(h)(1). Under regulations promulgated by the Internal Revenue Service, a taxpayer satisfies the requirements for material participation if she meets any one of seven tests, including (i) working more than 500 hours during a year in an activity, (ii) performing substantially all the work for an activity, or (iii) working more than 100 hours during a year in an activity where no one else works more than the taxpayer.[10]

By citing the tax code and its implementing regulations, this decision is not suggesting that the material-participation test under Delaware law should track tests from federal tax law. The more limited yet still pertinent observation is that the tax-oriented tests align with a plain-language approach to material participation.

Under a plain-language interpretation of Section 18-109(a)(ii), the plaintiffs are entitled to a pleading-stage inference that Harron participated materially in the management of the Companies. He served as the president of each entity, managed its day-to-day affairs, made decisions for the entity, and only sought approval from the officially designated manager for major issues like financial commitments. Put simply, the complaint pleads adequately that Harron served as the acting manager.

---

[10] 26 C.F.R. § 1.469-5t(a). Although the Internal Revenue Service has not promulgated regulations governing when a non-managing member would be deemed to have the attributes of a general partner for purposes of self-employment tax, the Service has applied similar factors, including a test based on participating in an entity's trade or business for more than 500 hours per year. *See* Burke, *supra*, at 594; Cunningham & Proctor, *supra*, § 18.03[D].

### 2. The Control Overlay

In his first major argument against service of process under Section 18-109(a)(ii), Harron relies on the control overlay. Tracing the references to a "control or decision-making role" leads to a decision in a books-and-records case called *Florida R & D Fund Investments, LLC v. Florida BOCA/Deerfield R & D Investments, LLC* (*Florida Investments*), 2013 WL 4734834 (Del. Ch. Aug. 30, 2013). That decision mentioned the phrase "control or decision-making role" once, in passing, without citing authority to support the formulation, and without providing any reason for departing from the statutory material-participation test. *Id.* at *8. The case involved odd facts, and it dismissed a complaint containing relatively sparse allegations.

Both legally and factually, *Florida Investments* provides an uncertain foundation for the control overlay. Later decisions have followed its language without testing the foundation's footings. Regardless, the control overlay is suspect because it departs from and constrains the statutory standard. The Delaware Supreme Court recently took a plain-language approach to a comparable jurisdictional statute in the *Hazout* case. In light of *Hazout* and the absence of any articulated justification for the control overlay, this decision declines to apply it.

#### a. *Florida Investments*

In *Florida Investments*, this court granted a motion to dismiss a defendant from an action seeking books and records. The decision concerned a special purpose vehicle (the "SPV") that had been formed to own, develop, and operate a real estate project in Florida. The plaintiff (the "Investor") held an 87% member interest in the SPV. The two minority

members were affiliates of the investment firm that sponsored the project. One minority member ("Services") served as the SPV's asset manager pursuant to an asset management agreement. *Id.* at *2.

After the Investor learned that Services had received an unauthorized payment from the SPV, and after the other minority member failed to make a capital contribution, the Investor demanded books and records to explore whether wrongdoing had occurred. The SPV produced the books and records that it maintained itself, but two of the requested categories were held by Services. The SPV declined to produce any books and records that Services held. *See id.* at *3–4.

The Investor responded by filing a books-and-records action against the SPV and Services. To establish jurisdiction over Services, the Investor relied on Section 18-109(a)(ii). The Investor argued that Services was an acting manager because the asset management agreement authorized Services to run the SPV's day-to-day operations. *Id.* at *8. Services moved to dismiss the complaint for lack of personal jurisdiction.

The *Florida Investments* court held that it lacked personal jurisdiction over Services. The decision began by quoting at length from the asset management agreement, which provided that Services was acting as an independent contractor and not as an agent of the SPV. The court regarded this language as "detract[ing] from [Investor's] contention that [Services] had participated materially in the management of the [SPV]." *Id.* The decision also noted that Services was "confined to acting 'as the asset manager,'" remarking that "management of the underlying assets of an LLC is analytically distinct from the management of the LLC itself for purposes of Section 18-109(a)(ii)." *Id.* Running contrary

22

to this commentary, the decision described the asset management agreement as giving Services "relatively broad authority to engage in most of the operation and supervision of the [SPV]." *Id.*

The court next turned to the Investor's complaint to assess whether the pled facts supported jurisdiction. The decision criticized the complaint for not alleging that Services "actually engaged in any of its contractually authorized conduct." *Id.* The decision also criticized the complaint for "offer[ing] very little, if anything, about [Services's] actual role in the operation of the [SPV]." *Id.* The opinion noted, "There is an allegation that [Services] maintains the books and records, but that alone does not constitute material participation in the management, especially in light of the designation of the board of directors as the [SPV's] manager." *Id.*

The opinion then introduced the phrase that subsequently evolved into the control overlay: "There are other incidental steps taken by [Services] that are alleged in the Complaint, but those allegations do not demonstrate the control or decision-making role necessary to satisfy the statutory standard for personal jurisdiction." *Id.* The decision did not cite any authority for this proposition. Instead, in a footnote, the opinion observed:

> It seems unlikely that a party who is alleged to have acted solely as a rental agent would be considered to be materially participating in management of the limited liability company that owned the rental property. The Complaint offers few allegations of fact as to what [Services] may have done for the [SPV] that would allow the Court to distinguish [Services] from that of a mere rental agent. Certainly the powers conferred by the Asset Management Agreement, if those powers were in fact broadly and routinely carried out, would create an interesting question of whether they constituted sufficient participation to be viewed as "material participation." Without those additional allegations in the Complaint, however, this hypothetical is a question which the Court need not, and should not, resolve.

*Id.* at *8 n.75.

It is difficult to draw strong conclusions from the abbreviated discussion in *Florida Investments*. By statute, books-and-records cases receive summary treatment, and this court strives to decide them quickly. A Monday-morning quarterback, here commenting years after the fact, lacks a first-hand sense of the facts and circumstances that informed the judicial judgment. But based solely on the language of the decision itself, an argument can be made that the Investor had alleged enough to support jurisdiction for purposes of a pleading-stage analysis in a books-and-records case. Section 18-109(a) supports the exercise of specific jurisdiction, not general jurisdiction, and the Investor only sought books and records. From this standpoint, the statutory standard of "participates materially in the management of the limited liability company" would seem to invite considering whether the complaint supported a reasonable inference that (i) the documents were material to the management of the SPV and (ii) Services maintained the documents. If so, then one could infer that Services was participating materially in the management of the SPV by maintaining those documents. To the extent the analysis extended to Services's role more broadly, the Investor could have received a pleading-stage inference that Services performed the functions it was entitled to perform under the asset management agreement. The *Florida Investments* decision declined to draw this inference based on a distinction between managing the entity and managing its assets, but for a single-purpose entity with only one asset, it is not clear how much daylight there is between those concepts.

For present purposes, the problematic legacy of *Florida Investments* is the reference to a "control or decision-making role." *Id.* at *8. To reiterate, the opinion did not provide

24

any explanation for introducing this overlay, nor did it cite any authority supporting it. When examining whether subsequent decisions should have embraced that language as the governing test, it remains pertinent that the control overlay originated as a passing phrase.

###### b. *Wakley*

One year after *Florida Investments*, the United States District Court for the District of Delaware applied the control overlay when determining whether a person had participated materially in the management of an LLC under Section 18-109(a)(ii). In doing so, the *Wakley* court made the control overlay more onerous by interpreting a "control or decision-making role" as requiring that the person named as a defendant be "effectively running [the entity's] entire business." *Wakley*, 2014 WL 1116968, at *5.

The *Wakley* litigation stemmed from the demise of Ensotran, LLC, whose founders had invented a low-cost manufacturing process for producing wire-grid polarizers. The promise of Ensotran's intellectual property attracted the interest of Wakley Limited, an investment fund, and Elmer Yuen, its principal.

After negotiating with Yuen, Ensotran's founders sold a one-third member interest to Wakley for $1,666,666.67. *Id.* at *2. As part of the deal, they agreed that Ensotran would be a manager-managed entity with a three-member board of directors. The members of the board would consist of Ensotran's two principals and an individual appointed by Wakley. They also agreed that Wakley could appoint a Vice President of Business Development and a Financial Controller for Ensotran. Both would be paid by Wakley. The Vice President of Business Development would have "sole responsibility to negotiate any sale, or licensing of any of the assets of Ensotran LLC, or the sale of Ensotran LLC or its

25

involvement in any joint ventures, subject to the decisions and instructions of the board." *Id.* (emphasis omitted). The Financial Controller would have "complete oversight and management of the finances of Ensotran LLC, subject to the decisions and instructions of the board." *Id.* (emphasis omitted).

Wakley appointed Yuen as its board representative, Roger Baar as the Vice President of Business Development, and Donna Baar, Roger's spouse, as the Financial Controller. After the investment closed, Donna prepared financial statements documenting the equity investment and showing Wakley owning a one-third member interest.

After assuming their positions, Yuen and Roger involved themselves in Ensotran's day-to-day operations. Yuen and Roger wanted Ensotran to pursue one process for developing the wire-grid polarizer, while Ensotran's founders wanted to pursue a different process. Ensotran alleged that "Roger took control of Ensotran's day-to-day operations and the technology involved in developing a prototype wire-grid polarizer on April 18, 2012." *Id.* at *3. Ensotran alleged that "[o]ver the next month, Roger continued to control Ensotran's day-to-day operations, and obtained further technical information from [one of Ensotran's founders] to develop a wire-grid polarizer prototype." *Id.*

Meanwhile, Donna transferred $989,914.53 from Ensotran to the Baars' personal entity. She then prepared new financial statements for Ensotran reflecting that Wakley had *loaned* $722,070.97 to Ensotran and was owed that amount as a creditor. Wakley subsequently declared the loan in default, and Roger demanded that Ensotran issue Wakley a 55% member interest to satisfy the loan. Ensotran became insolvent.

In the ensuing litigation, Ensotran asserted claims for breach of fiduciary duty and conversion against the Baars. To serve them, Ensotran relied on Section 18-109(a). After concluding that the Baars were not formal managers, the district court analyzed whether the Baars nevertheless qualified as acting managers.

As to Roger, the district court was "not persuaded" that he "'took over in all respects' the day-to-day operations and effectively ran Ensotran's entire business." *Id.* at *5. After reviewing the emails on which Ensotran relied, the court held that Roger was managing only one of Ensotran's projects, albeit its most important one. The court also rejected the idea that Roger was "wholly" managing the project, noting that Roger had asked questions of Ensotran's founders, "which suggests that [the founders] possess the relevant information concerning the project that Ensotran contends Roger wholly manages." *Id.* The court further reasoned that "allegations that Roger assumed management over *one* of [Ensotran's] projects," even "Ensotran's main project," did not "equate to Roger effectively running Ensotran's entire business . . . ." *Id.* Citing *Florida Investments* for the control overlay, the court concluded that "these acts fail to demonstrate the necessary control or decision-making role that has been found to satisfy the statutory standard for personal jurisdiction." *Id.*

As to Donna, the district court reached a similar conclusion. To support jurisdiction, Ensotran cited her role as the Financial Controller and contended that she "(1) was authorized to prepare the financial statements of Ensotran, (2) prepared and maintained Ensotran's books and records setting forth the equity interests of each member, (3) was the sole signatory on Ensotran's bank account, and (4) oversaw and managed the disbursement

27

of approximately \$720,000 of Ensotran's funds." *Id.* at \*6. The district court regarded these allegations as suggesting only that Donna had managed Ensotran's assets, citing *Florida Investments* for the proposition that "management of the underlying assets of an LLC is analytically different from the management of the LLC itself . . . ." *Id.* (quoting *Florida Investments*, 2013 WL 4734834, at \*8).

Through this analysis, *Wakley* elevated the control overlay from a passing phrase to an operative test, while further elevating the necessary level of involvement to require "effectively running [the LLC's] entire business." Other than citing *Florida Investments*, the *Wakley* decision did not discuss its choice of these more onerous standards, which had evolved considerably from what a plain-language interpretation of material participation would suggest.[11]

### c. *Hazout*

The lack of a meaningful explanation for the control overlay provides one good reason to reconsider it. The *Hazout* case requires abandoning it.

---

[11] As Harron notes, two decisions of this court—*Arctic Ease* and *CelestialRX*—have subsequently quoted and applied the control overlay. Neither decision elaborated on why the control overlay should replace the statutory standard; both treated the issue as settled. *Arctic Ease* cited *Wakley*, and *CelestialRX* cited *Arctic Ease*. *See CelestialRX*, 2019 WL 1396764, at \*19 n.298; *Arctic Ease*, 2016 WL 7174668, at \*4. Both decisions then focused on the implications of a formal manager designation for acting manager status. Both cases are thus more pertinent to Harron's second argument, which implicates that issue, and this decision discusses *Arctic Ease* and *CelestialRX* in that context. Neither decision provides additional support for the control overlay itself.

In *Hazout*, the Delaware Supreme Court considered whether a plaintiff could serve a Canadian resident, Marc Hazout, who had served as the President, CEO, Principal Financial and Accounting Officer, and a director of Silver Dragon Resources, Inc., a Delaware corporation. The plaintiff alleged that Hazout acted as the lead negotiator for Silver Dragon when negotiating the terms of a capital infusion with a group of investors. When the deal fell apart, the investors sued both Hazout and Silver Dragon.

Hazout moved to dismiss for lack of personal jurisdiction, arguing that Delaware's consent-to-service statute for directors and officers, 10 *Del. C.* § 3114, did not apply because the lawsuit did not allege a breach of any duty that Hazout owed to Silver Dragon or its stockholders. In making this argument, Hazout relied on three decades of authority, starting with *Hana Ranch, Inc. v. Lent*, 424 A.2d 28 (Del. Ch. 1980), that had construed Section 3114 to extend only to claims asserting that the defendant had breached duties owed to the corporation or its stockholders.

In *Hazout*, the Delaware Supreme Court abrogated *Hana Ranch* and its progeny, relying on the plain language of Section 3114. *Hazout*, 134 A.3d at 277, 286–87, 289–90. The high court noted that the statute authorized service of process in two classes of cases: (i) "all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary or proper party," and (ii) "any action or proceeding against such officer for violation of a duty in such capacity." *Id.* at 277 (quoting 10 *Del. C.* § 3114). After recognizing that the *Hana Ranch* line of authority effectively eliminated the first class of cases, the justices admonished:

> [W]e do not believe that it is a proper role for the Judiciary to excise a clear category set forth in § 3114(b), simply because there might be cases where it is susceptible to an overly broad reach. . . . Rather, under settled principles of statutory interpretation, it is our obligation to give effect to the plain language of statutes to the extent we can do so without offending any supervening constitutional limits.

*Id.* at 278. The court later reiterated that "blanket judicial invalidation of a statute's words should not ensue if the statute can be applied constitutionally in a wide class of cases, but might operate overbroadly in some more limited class of cases." *Id.* at 287. If effectuating service in some cases could result in an overly broad assertion of jurisdiction, then the proper response is to "use the minimum contacts analysis required by [the Due Process Clause] to ensure that the statute is not used in a situationally inappropriate manner." *Id.* at 291; *see also id.* (citing doctrine of *forum non conveniens* as "a viable tool" for "address[ing] the burden to nonresident fiduciaries of addressing litigation in our state").

The control overlay limits Section 18-109(a)(ii) in a manner analogous to *Hana Ranch*'s construction of Section 3114. Rather than applying the plain language of the statute to authorize service of process over any person who participates materially in managing the business of an LLC, the control overlay restricts service of process to persons who serve in a control or decision-making role. Under *Hazout*, it oversteps the judiciary's role to interpret Section 18-109(a)(ii) to eliminate a class of persons from the statute's scope. In light of *Hazout* and the unconvincing origins of the control overlay, this decision declines to apply it.

### 3. The Formal Manager Designation

In his next major argument, Harron contends that a defendant cannot serve as an acting manager if the operative LLC agreement contains a formal manager designation. The foundational case for this argument is *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156 (Del. Ch. May 7, 2008), and as with *Florida Investments*, the foundation is not as solid as it might appear. In this instance, *Fisk Ventures* mistakenly built on a prior case—*Palmer v. Moffat*, 2001 WL 1221749 (Del. Super. Oct. 10, 2001)—which it described as having decided the issue. *See Fisk Ventures*, 2008 WL 1961156, at *8 (citing *Palmer* as having "previously considered and rejected" the acting-manager argument). In reality, *Palmer* did not consider whether the defendants in that case qualified as acting managers. As the *Palmer* decision noted, the plaintiff had not made an acting-manager argument. *See Palmer*, 2001 WL 1221749, at *2 ("Plaintiff concedes that the second definition does not apply to the Spencer Defendants, that is, that they did not participate materially in managing the Company."). *Palmer* only considered whether the defendants qualified as formal managers. *See id.* The entire line of authority on formal manager designations thus stems from a mistaken citation.

In addition, reliance on a formal manager designation to foreclose acting-manager status runs contrary to the structure of the LLC Act. By default, a Delaware LLC has a member-managed governance structure. *See* 6 *Del. C.* § 18-402. To establish a manager-managed structure, the LLC Act requires that the governing LLC agreement contain provisions vesting authority in a formal manager. *Id.* By statutory mandate, therefore, the LLC agreement of a manager-managed entity must contain a formal manager designation.

Under the *Fisk Ventures* line of authority, a manager-managed LLC cannot have an acting manager. That result, however, conflicts with Section 18-109(a), which recognizes that any LLC, including a manager-managed entity, can have both formal managers and acting managers. Given this conflict, this decision declines to give jurisdiction-foreclosing effect to the formal manager designations in the International and LATAM Agreements.

### a. *Fisk Ventures*

The *Fisk Ventures* decision arose out of the demise of Genitrix, LLC, which had been governed by a five-member "Board of Member Representatives." Fisk Ventures, LLC was a Class B member with the right to appoint one board member. Fisk Johnson owned 99% of Fisk Ventures, had also invested personally in Genitrix, and had the right to appoint two board members. At one point, Johnson had served on the board, but he resigned before the events giving rise to the litigation. *Fisk Ventures*, 2008 WL 1961156, at *3.

After Genitrix failed, its disappointed founder, Andrew Segal, sued Johnson. Segal contended that Johnson was an acting manager under Section 18-109(a)(ii) because he (i) controlled his board appointees and (ii) participated in the management of Genitrix through broad veto rights. The decision rejected the first theory, finding that various emails evidencing Johnson's occasional communications with his appointees did "not support the notion that Johnson was materially participating in the management of Genitrix." *Id.* at *7.

The decision also rejected Segal's second theory, which contended that Johnson was an acting manager because of his governance rights. In ruling on this issue, the *Fisk Ventures* court cited *Palmer* as authoritative:

Segal's second theory—that the LLC Agreement gives Johnson so much power that he is a *de facto* manager—has been previously considered and rejected. In *Palmer v. Moffat*, Judge Babiarz of the Superior Court confronted a dispute among members and managers of a Delaware limited liability company. There, plaintiffs argued that some of the LLC's members, though not called "managers," served as managers on account of the powers conferred to them by the LLC Agreement. Specifically, the LLC Agreement in that case stated that "The Members shall have full, exclusive, and complete discretion, power and authority . . . to manage, control, administer and operate the business and affairs of the company for the purposes herein stated, to make all decisions affecting such business and affairs . . . ." Despite this broad language, Judge Babiarz found it insufficient to render all members "managers" for the purpose of section 18-109, because another provision of the agreement stated that "[t]he operations of the Company shall be conducted by the Management Committee."

*Id.* at *8 (footnotes omitted). It is true that *Palmer* reached this holding, but it did so for purposes of analyzing the question of *formal-manager* status, not *acting-manager* status. The plaintiff in *Palmer* never argued that the defendants were acting managers. *Palmer*, 2001 WL 1221749, at *2. The entity in *Palmer* was a member-managed entity, and the plaintiff argued that by virtue of that fact, every member (including the defendants) was a manager and subject to service under Section 18-109(a)(i). *See id.* ("Plaintiff's construction of the Operating Agreement boils down to an argument that all members are managers."). The court rejected this contention because, despite explicitly establishing a member-managed structure, the LLC agreement vested "actual authority" in a management committee. *Id.* The court held that the creation of the management committee prevented the defendants from being formal managers under Section 18-109(a)(i). *Palmer* did not address acting-manager status under Section 18-109(a)(ii).

The *Fisk Ventures* decision, however, treated *Palmer* as authoritative for purposes of Section 18-109(a)(ii). Turning to the Genitrix LLC agreement, the *Fisk Ventures*

decision described the following provision as "even more specific" than the dispositive provision in *Palmer*:

> Except as otherwise provided herein, the members shall conduct, direct and exercise full control over all activities of the company through their representatives of the board. Unless delegated by the Board, all management powers over the business and affairs of the Company *shall be exclusively vested in the board*.

*Fisk Ventures*, 2008 WL 1961156, at *8. The *Fisk Ventures* decision concluded that "[a]s in *Palmer*," the designation of the board as the formal manager precluded Johnson from qualifying as an acting manager.

On the facts of *Fisk Ventures*, this holding was not problematic, because it fit with the limited factual allegations regarding Johnson's involvement with Genitrix. Setting aside Johnson's communications with his board representatives, those actions amounted to Johnson and Fisk Ventures standing on or exercising their contractual rights as members. The reference to the formal manager designation in the Genitrix LLC agreement did not add anything to the analysis.

But as one of the earliest cases to address service under Section 18-109(a)(ii), *Fisk Ventures* was widely cited, including by Harron's principal authorities.[12] The rule that *Fisk Ventures* drew from *Palmer* thus permeated the case law.

---

[12] The *Wakley* and *Florida Investments* decisions included parallel citations to *Palmer* and *Fisk Ventures*, framed in a manner that suggested that the courts were relying on *Fisk Ventures*'s analysis of *Palmer*. *See Wakley*, 2014 WL 1116968, at *5 n.7; *Florida Investments*, 2013 WL 4734834, at *8 n.73. The more recent decisions on which Harron relies—*Arctic Ease* and *CelestialRX*—only cited *Fisk Ventures* and not *Palmer*, but both

### b. *Wakley*, *Arctic Ease*, and *CelestialRX*

Harron relies on three decisions—*Wakley*, *Arctic Ease*, and *CelestialRX*—that referenced formal manager designation when addressing acting-manager status under Section 18-109(a)(ii). These cases are not persuasive precedent's for Harron's motion to dismiss.

The reference to a formal manager designation in *Wakley* is the most elliptical. There, after discussing the factual allegations regarding Donna's role as Financial Controller and rejecting their sufficiency, the court cited the existence of a formal manager designation as an additional reason for not exercising jurisdiction. The decision stated:

> Although the Term Sheet [for the sale of equity to Wakley] granted [Donna] broad authority over Ensotran's finances, her power was "subject to the decisions and instructions of the board." Therefore, the court finds Donna is not a "manager" under § 18-109(a)(ii) because she did not participate materially in the management of Ensotran.

*Wakley*, 2014 WL 1116968, at *6. This brief reference does not appear to have played a meaningful role in the court's analysis, because the decision had already concluded that Donna was not subject to service based on its interpretation of the control overlay. Reinforcing this impression is the fact that the decision could have made the same point about Roger, who likewise reported to the board in his role as Vice President of Business Development. But the case did not mention the formal manager designation as part of its otherwise more thorough analysis of Roger's involvement with Ensotran.

---

cited *Wakley*, and *CelestialRX* also cited *Florida Investments. See CelestialRX*, 2019 WL 1396764, at *19 nn. 293 & 298; *Arctic Ease*, 2016 WL 7174668, at *4 & n.44.

35

The presence of a formal manager designation took on greater significance in *Arctic Ease*. That litigation arose out of the demise of two Delaware LLCs: Summetria, LLC and its wholly owned subsidiary, Arctic Ease, LLC. Although Arctic Ease gained pride of place in the caption, the pertinent events for Section 18-109(a) concerned Summetria.

In mid-2012 and again in early 2013, Summetria needed capital to support Arctic Ease's business. Summetria obtained it through loans from William Cohen, who at the time controlled a 20% member interest in Summetria and served on its board of directors. *Arctic Ease*, 2016 WL 7174668, at *1.

Summetria continued to need funds and retained an investment bank to raise capital. In April 2013, Cohen told Carol Forden, who served as Summetria's managing member, that the investment bank would not provide any bridge financing unless Cohen guaranteed the loan, which Cohen seemed unwilling to do. Cohen later told Forden that he would not support a bridge financing because its terms would conflict with his rights as an investor.

Cohen subsequently resigned from the board and declared a default under his note. Other lenders called their loans. Cohen eventually purchased Summetria's assets in a foreclosure sale. In the resulting dissolution proceeding, Forden and her affiliates sued Cohen and his affiliates based on Cohen's alleged role in causing the entities' demise, contending that Cohen had schemed all along to starve them of financing so that he could purchase their assets at a discount. Forden and her affiliates asserted that Cohen was subject to jurisdiction as an acting manager of Summetria, claiming he participated materially in management by negotiating a contract with a reseller for Arctic Ease's products, attending

36

meetings with distributors of Arctic Ease's products, otherwise marketing Arctic Ease's products, and serving in an investor relations role.

Cohen moved to dismiss the claims against him for lack of personal jurisdiction. The *Arctic Ease* decision rejected the plaintiffs' argument that Cohen participated materially in the management of Summetria. Drawing on *Wakley*, the court reasoned that because Forden was Summetria's managing member, and because Summetria's LLC agreement empowered the managing member to manage the entity, Cohen could not have served in the type of "control or decision-making role" necessary to satisfy the control overlay. *Id.* at *5 (quoting *Wakley*, 2014 WL 1116968, at *5–6). The court concluded that "to the extent Cohen had any power, it was subject to Forden's decision-making authority under the Summetria LLC Agreement." *Id.*

As in *Fisk Ventures*, the outcome in *Arctic Ease* was not problematic on the facts because Forden's allegations would not have supported the exercise of specific jurisdiction. The claims that Forden asserted against Cohen do not appear to have arisen out of any of the actions he took on behalf of Summetria or Arctic Ease. The plaintiffs instead seem to have been trying to tie Cohen generally to those entities while at the same time claiming that he acted wrongfully by foreclosing on his loan.

Lastly, in *CelestialRX*, the plaintiffs sought to assert claims on behalf of an LLC ("Akrimax") against Leonard Mazur, who had cofounded Akrimax and served for years as a member of its board of directors. *CelestialRX*, 2019 WL 1396764, at *5. In 2013, however, the LLC agreement was amended to name Joseph Krivulka as sole manager. *Id.* at *9. Mazur retained the title of Vice Chairman, and in subsequent years he spoke often

37

with Krivulka about the business. He also engaged an investment banker to advise the company on strategic alternatives. *Id.* at \*19.

Citing *Arctic Ease*, *Wakley*, and *Florida Investments*, the *CelestialRX* decision held that after the LLC agreement was amended to make Krivulka the sole manager, Mazur could not have participated materially in management because he no longer occupied a control or decision-making role. As the decision explained:

> Here, Amendment No. 7, in explicit terms, put Krivulka solely at the helm of Akrimax on July 1, 2013. . . . The Plaintiffs' allegations that Mazur retained his title as vice chairman and engaged a banker on behalf of Akrimax are not sufficient to suggest that Mazur materially participated in the management of Akrimax, when Krivulka alone had the authority to manage Akrimax and the Plaintiffs allege that Krivulka asserted this authority. Nothing in those allegations suggests that Mazur acted outside of or usurped Krivulka's control.

*Id.* (footnotes omitted). As in *Fisk Ventures* and *Arctic Ease*, the *CelestialRX* decision reached a logical outcome on the facts, because the allegations against Mazur do not appear to have supported jurisdiction under a plain-language interpretation of the material-participation test.

Harron thus can legitimately cite *Wakley*, *Arctic Ease*, *CelestialRX* as referring to formal manager designations when analyzing acting-manager status, but the cases offer little else for his position. At one level, the formal manager designation derives from the control overlay, which is problematic under *Hazout* and for the other reasons discussed above. At another level, the formal manager designation is suspect because it originated from a misreading of *Palmer*, which none of the subsequent decisions identified or addressed. And when examined in their own right, Harron's three precedents reached

38

outcomes for which the formal manager designation was unnecessary, either because the defendant could not be served under the plain-language of the statute (*Arctic Ease* and *CelestialRX*) or based on reasoning elsewhere in the decision (*Wakley*).

For these reasons, none of Harron's cases supports the proposition that the most senior executive in an LLC, who manages the business on a day-to-day basis, cannot be served under an acting manager theory simply because the LLC agreement designates a formal manager. Harron's reliance on the formal manager designations in the International and LATAM Agreements is unconvincing.

### c.      The Structure of the LLC Act

Section 18-402 of the LLC Act provides an equally significant reason for rejecting Harron's reliance on the formal manager designations in the International and LATAM Agreements. Under Section 18-402, by default, a Delaware LLC does not have formal managers; it has a member-managed structure in which each member also acts as a manager. *See* 6 *Del. C.* § 18-402. To create a manager-managed structure, the LLC agreement must expressly vest authority in one or more managers. *Id.* It will thus always be the case that the LLC agreement for a manager-managed entity contains a formal manager designation. *See generally* Symonds & O'Toole, *supra*, § 9.01 (describing default member-managed structure and ability to create manager-managed alternatives).

If the statutorily required provisions for creating a manager-managed structure meant that only formal managers could participate materially in management, then a manager-managed LLC could not have acting managers. That outcome is contrary to Section 18-109(a), which contemplates that any LLC, including a manager-managed LLC,

can have acting managers. *See* 6 *Del. C.* § 18-109(a)(ii); *see also id.* § 18-110(c). Put differently, the fact that the LLC Act contemplates that a manager-managed LLC can have acting managers means that a provision empowering a formal manager should not be dispositive for purposes of Section 18-109(a)(ii).

From the standpoint of a member-managed entity, the default governance structure under Section 18-402 has an even more significant implication: rejection of the control overlay. By default, when an entity is member-managed, each member can bind the entity to the same degree as a formal manager. *See id.* § 18-402 ("Unless otherwise provided in a limited liability company agreement, each member and manager has the authority to bind the limited liability company."). Given this fact, a plaintiff might argue, like the plaintiff in *Palmer*, that every member of the LLC can be served as a formal manager under Section 18-109(a)(i). But a credible response is that the LLC agreement of a member-managed LLC has not designated a formal manager, thereby eliminating that jurisdictional path. The focus would then turn to Section 18-109(a)(ii) and whether the member named as a defendant participated materially in the management of the entity for purposes of the claims being asserted. Because Section 18-109(a) supports specific jurisdiction and not general jurisdiction, the plaintiff could serve those members who had participated materially in the events giving rise to the claim, but not every member of the LLC.

Now introduce the control overlay. If a person is subject to service under Section 18-109(a) only if the person occupies a "control or decision-making role," then no one could satisfy this test for a multi-member, member-managed LLC. Under the default

40

governance scheme, no one member controls the LLC, and no one member has the power to make decisions on behalf of the LLC. By default,

> [u]nless otherwise provided in a limited liability company agreement, the management of a limited liability company shall be vested in its members in proportion to the then current percentage or other interests of members in the profits of the limited liability company owned by all of the members, the decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling . . . .

6 *Del. C.* § 18-402. It is of course possible, as in *Palmer*, that the LLC agreement for a member-managed LLC could contain provisions that would lead a court to treat some members but not others as formal managers, or potentially as acting managers, but under the default framework, it is not clear that anyone could be served if the control overlay were the governing test. Harron's contention that a formal manager designation forecloses service under Section 18-109(a)(ii) depends on and falls with the control overlay.

The structure of Section 18-402 thus counsels against applying the control overlay and against relying on a formal member designation. By contrast, reading Section 18-109(a)(ii) broadly to extend to anyone who participates materially in the business of the LLC comports with what appears to be a conscious decision by the drafters of the LLC Act to extend service beyond formal managers. The LLC Act stands alone among the Delaware entity statutes in taking this step. The statutes governing other entities—corporations, general partnerships, limited partnerships, and business trusts—apply only to formal

41

officeholders.[13] Because LLCs have flexible governance structures and often operate with a relatively high degree of informality, the broader formulation enables Delaware courts to exercise personal jurisdiction over key individuals who take action on behalf of the entity.

Delaware's experience with corporate officers underscores the need for the LLC Act's reach. The implied-consent statute in the corporate context originally applied only to directors, and Delaware courts lacked the ability to exercise personal jurisdiction over senior officers. *See* 10 *Del. C.* § 3114(a); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 778 (Del. Ch. 2009). The omission became problematic, and to fill the gap, the General Assembly extended Section 3114 to senior officers. *See* 10 *Del. C.* § 3114(b). Section 18-109(a)(ii) avoids a similar problem by enabling Delaware courts to exercise personal jurisdiction over individuals who participate materially in the business of an LLC, regardless of title, for claims relating to their actions.

Statutory analysis thus provides another reason for rejecting Harron's second argument. In light of the implications of Section 18-402 and the other reasons discussed previously, this decision rejects Harron's argument about the formal manager designations in the International and LATAM Agreements.

### 4. The Agency Shield

In his last argument, Harron invokes the agency shield. He contends that if a person

---

[13] *See* 6 *Del. C.* § 15-114(a) (partner in general partnership); *id.* § 17-110(a) (general partner of limited partnership); 10 *Del. C.* § 3114(a) (corporate director elected, appointed, or serving after September 1, 1977); *id.* § 3114(b) (corporate officer elected, appointed, or serving after January 1, 2004); 12 *Del. C.* § 3804(b) (trustee of statutory trust).

participates materially in the management of an LLC while acting as an agent, then the person's actions as agent cannot support a finding of material participation because the agent is acting on behalf of his principal. This decision reject this argument.

As support for his agency-shield argument, Harron returns to *Wakley*. That decision deployed the concept of an agency shield as an additional reason why Roger and Donna had not participated materially in the management of Ensotran. After ruling that the complaint's allegations did not satisfy the control overlay, and after citing the fact that Donna reported to the board of directors, the district court observed that Roger and Donna were acting on behalf of Wakley and Yuen, concluding: "Ensotran's averments fail to convince the court that Roger and Donna were not acting at the direction of, and as representatives for, Wakley and Yuen." *Wakley*, 2014 WL 1116968, at *6. The decision's analysis did not go much further than this sentence.

As readers of this opinion will have perceived by now, *Wakley* was a decision with many moving parts. In the section that comprised the bulk of its analysis of Section 18-109(a)(ii), *Wakley* held that Roger was not an acting manager after conducting a detailed inquiry into whether factual allegations about his involvement rose to the level of a "control or decision-making role," which the court equated with "effectively running Ensotran's entire business . . . ." *Id.* at *5. In the section devoted to Donna, the decision conducted a more generalized review of the factual allegations about her involvement, then jumped to her reporting arrangement with the board of directors and the concept of a formal manager designation. The latter move was unnecessary because the allegations against Donna fell short under the standard that the decision had applied to Roger. At the same time, citing

43

the formal manager designation introduced a rationale that could have applied equally to Roger, but which the decision had not mentioned previously. The decision then referenced Roger and Donna's status as agents for Wakley and Yuen, which the opinion seemed to regard as an independent ground for not exercising jurisdiction over both of them. Any one of these three rationales could be viewed as dispositive and the other two as *dicta*. Given *Wakley*'s abbreviated discussion of the agency shield, it is tempting to view this aspect of the decision as *dictum*.

Elsewhere in the decision, *Wakley* summarized this court's decision in *Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724 (Del. Ch. Dec. 1, 2009). The *Vichi* decision had discussed a defendant's role as an agent when declining to exercise personal jurisdiction under Section 18-109(a)(ii), so it seems likely that *Wakley*'s comment about agency status stemmed from *Vichi*. Unfortunately, *Vichi*'s discussion of the agency issue is not much more detailed than *Wakley*'s.

The complex facts of *Vichi* involved a snarl of entities. Koninklijke Philips Electronics N.V. ("Philips") had formed a joint venture with LG Electronics. That joint venture formed a subsidiary ("Finance Sub") as a special purpose vehicle to raise capital. Finance Sub otherwise had no assets or operations. Another subsidiary of the joint venture ("Manager Sub") served as the sole member and manager of Finance Sub. The plaintiff, Carlo Vichi, loaned a large sum to Finance Sub. One of the defendants, Kiam-Kong Ho, was an employee of Manager Sub. Ho helped form Finance Sub, and he acted on behalf of Finance Sub when negotiating and signing the loan documents with Vichi. *See id.* at *1–3.

Finance Sub subsequently defaulted on the loan, and the joint venture declared

44

bankruptcy. Striving to identify a theory of recovery against a solvent defendant, Vichi asserted tort claims for fraud and breach of fiduciary duty against Ho, Manager Sub, and Philips. Ho moved to dismiss for lack of personal jurisdiction. After concluding that jurisdiction did not exist under the Delaware Long-Arm Statute, the court reached the same conclusion under Section 18-109(a)(ii), reasoning as follows:

> Vichi's allegations of Ho's material participation are based on assertions that Ho (1) had a direct role in the formation of [Finance Sub] and (2) executed certain documents relating to the issuance of the Notes on behalf of [Finance Sub]. *Neither of these assertions, however, alleges that Ho was acting in anything other than his capacity as a representative of [Manager Sub], his formal employer at the time and [Finance Sub's] manager.* Nothing in the record suggests that Ho had any ownership share in [Finance Sub], or a personal stake in the Notes transaction. In other words, Vichi does not allege any benefit to Ho from the formation of [Finance Sub] or the Notes transaction. *Nor has Vichi alleged any other specific facts from which the Court reasonably could infer that Ho personally participated materially in the management of [Finance Sub], rather than simply at the direction of and as a representative for [Manager Sub] and ultimately its parent, [the joint venture].*

*Id.* at *7 (emphasis added). The court concluded that Ho was "not a 'manager' of an LLC within the meaning of § 18-109, and the statute provides no basis for exercising jurisdiction over Ho." *Id.* The decision did not otherwise explain the relevance of Ho's status as agent.[14]

---

[14] In addition to the two sentences citing Ho's agency status, two other aspects of this paragraph are confusing. One refers to the absence of any indication "that Ho had any ownership share in [Finance Sub]." Section 18-109(a)(ii) specifies that a person may be an acting manager "whether or not a member of a limited liability company," so Ho's lack of a member interest in Finance Sub should not have mattered. Another refers to Ho not having "a personal stake in the Notes transaction." The material participation test turns on participation, not benefit, so the fact that Ho did not have a personal interest in the transaction should not have mattered.

The *Wakley* and *Vichi* decisions thus raised the important question of how to apply Section 18-109(a)(ii) to a person who participates in management while acting as an agent, either as a representative of a third party (*Wakley*) or as a representative of a formal manager (*Vichi*). Both cases treated agency status as dispositive, but without explaining why. At least two interpretations seem possible. It might be that the decisions evaluated the agent's role under the control overlay, with the operative question becoming whether the agent could occupy a "control or decision-making role" despite acting under the control of a principal with final decision-making authority. Or it might be that the decisions regarded the availability of service under Section 18-109(a)(ii) as subject to the broader fiduciary-shield doctrine, which holds that when an officer or other agent for an entity engages in acts within a jurisdiction in an official capacity, the agent is not subject to jurisdiction based on official acts, but only for acts committed in a personal capacity. Both approaches deviate from a plain-meaning analysis under Section 18-109(a)(ii), in which a court would analyze the defendant's actions to determine whether they rose to the level of material participation, without affording any special significance to the defendant's status as an agent.

Because *Vichi* did not otherwise discuss the control overlay, it seems unlikely that the decision examined Ho's status within that rubric. It seems more likely that the decision applied a version of the fiduciary shield. *Wakley* discussed the control overlay, but because *Wakley* appears to have relied on *Vichi*, it seems likely that *Wakley* also applied a version of the fiduciary shield. But it is not possible to rule out the control-overlay interpretation.

The viability of evaluating an agent's role within the control overlay depends on the

46

viability of the control overlay itself. As this decision has discussed at length, the control overlay is suspect, and this decision has declined to apply it. But accepting that framework for purposes of analysis, an actor's status as an agent for a third party (as in *Wakley*) should not defeat the actor's ability to serve in a "control or decision-making role" for a different entity. The control overlay appears to focus on the ability of the defendant to make decisions that bind the entity or otherwise exercise authority on its behalf. A third party's agent can do these things. As shown by Delaware decisions involving dual fiduciaries, persons frequently make decisions on behalf of one entity while simultaneously owing fiduciary duties to a different entity, whether as agents or otherwise.[15] To the extent the competing duties conflict, the dual fiduciary does not lose the ability to exercise managerial authority. The conflicted dual fiduciary instead faces heightened liability risk.

When the defendant acts as an agent for the LLC's formal manager (as in *Vichi*), the defendant can legitimately claim not to have had the formal power to exercise ultimate control, but that should not lead automatically to a conclusion that the agent did not occupy a "control or decision-making role." The analysis would have to consider the facts of the case, including the scope of the delegation of authority from the principal to the agent, the

---

[15] *See, e.g.*, *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as directors of subsidiary in transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–37 (Del. Ch. 1987) (same); *see also In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009) (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

degree of supervision and involvement of the principal, and whether the agent in fact made the decision or actually exercised control, notwithstanding the locus of formal authority.[16] In this case, in addition to these dimensions, the analysis would have to consider the consent rights that Harron possessed for the lists of Unanimous Approval Actions, which mitigated the extent to which the Companies' formal managers could fully exercise control.

To ignore these types of case-specific permutations and apply the agency shield automatically would give dispositive effect to a formal manager designation, thereby elevating formality above all else. As discussed previously, the cases relying on a formal manager designation do not appear to have gone that far, and doing so would run contrary to the statutory structure established by Section 18-402 of the LLC Act. Cases examining control in other contexts take a "fact-intensive" approach that does not turn solely on whether another actor, such as the board of directors, has statutory authority to act on behalf of and bind the corporation.[17] Even under the control overlay, Harron's argument for a

---

[16] *See, e.g.*, Restatement (Second) of Agency § 33 (Am. Law Inst. 1958) ("An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts."); *id.* § 26 cmt. e ("Since the existence of authority is dependent upon the reasonable belief of the agent in view of the manifestations of the principal, authority is not static but varies with changing facts . . . .").

[17] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*10 (Del. Ch. Oct. 24, 2014) (surveying cases and citing "fact-intensive" nature of control inquiry); *see, e.g.*, *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) (holding that 43.3% stockholder who appointed five of eleven directors controlled company); *Reith v. Lichtenstein*, 2019 WL 2714065, \*7–10 (Del. Ch. June 28, 2019) (finding that complaint's allegations supported reasonable inference that defendant controlled company through combination of 35.62% equity stake, significant board representation, and influence over

48

bright-line rule based on agency status appears misguided.

The alternative to the control-overlay interpretation—a version of the fiduciary shield—is even more problematic. Scholars have thoroughly critiqued the fiduciary shield and argued for its rejection,[18] citing (i) its dubious origins in misinterpreted *dicta*,[19] (ii) inconsistencies with otherwise applicable principles of jurisdictional analysis,[20] (iii) illogical conflicts between the outcome under the fiduciary shield and the outcome as a

---

management). *See generally Klein v. Wasserman*, 2019 WL 2296027, at *8–9 (Del. Ch. May 29, 2019) (discussing factors pertinent to finding of control).

[18] *See, e.g.*, Nat Stern, *Circumventing Lax Fiduciary Standards: The Possibility of Shareholder Multistate Class Actions for Directors' Breach of the Duty of Due Care*, 72 Neb. L Rev. 1, 18 (1993) (criticizing doctrine as an "effort to pre-empt the minimum contacts standard's individualized inquiry with a wooden rule"); Robert A. Koenig, Note, *Personal Jurisdiction and the Corporate Employee: Minimum Contacts Meet the Fiduciary Shield*, 38 Stan. L. Rev. 813, 814 (1984) (concluding that "the fiduciary shield rule cannot substitute for thorough analysis under existing constitutional standards governing personal jurisdiction"); Carlos R. Carrasquillo, Note, *The Fiduciary Shield Doctrine: A Rule of Statutory Construction or a Constitutional Principle?*, 9 J. Corp. L. 901, 930 (1984) (concluding that "[c]ourts should not, therefore, make this exception when determining jurisdictional amenability"); Thomas H. Sponsler, *Jurisdiction Over The Corporate Agent: The Fiduciary Shield*, 35 Wash. & Lee L. Rev. 349, 365 (1978) ("[T]he doctrine . . . , having come into existence through misunderstanding and having thrived on lack of articulation and analysis, should be allowed to fade away in the course of more reasoned application of established principles.").

[19] *See* Koenig, *supra*, at 820–21 (tracing origins of doctrine); Carrasquillo, *supra*, at 907–12 (same); Sponsler, *supra*, at 351–62 (same).

[20] *See* Koenig, *supra*, at 828–32 (discussing conflict with minimum-contacts analysis); Carrasquillo, *supra*, at 915–16, 918, 920, 925–26 (same); Sponsler, *supra*, at 365 (same).

matter of substantive law,[21] (iv) an unprincipled distinction between business torts and physical torts,[22] and (v) contrary reasoning in two decisions from the Supreme Court of the United States.[23]

As with the fiduciary-shield doctrine generally, Harron's agency-shield argument conflicts with otherwise applicable principles of jurisdictional analysis. The Delaware Long-Arm Statute explicitly authorizes service on a party who engages in forum-directed activity "in person or through an agent." 10 *Del. C.* § 3104(c)(1). Under the plain language of the Delaware Long-Arm Statute, agency status expands jurisdiction; it does not limit it.

The same is true under the common-law agency theory of jurisdiction, which provides a basis for asserting jurisdiction over a non-resident principal by attributing the jurisdictional contacts of the agent to the principal. *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[c][3] (2d ed. & Supp. 2018). When this theory applies, it does not shield the agent from jurisdiction, nor does it substitute the principal for the agent; it instead

---

[21] *See* Carrasquillo, *supra*, at 918, 925–26, 930 (noting conflict with principles of substantive law).

[22] *See id.* at 916–17.

[23] *See Calder v. Jones*, 465 U.S. 783, 790 (1984); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); Stern, *supra*, at 18–19 (discussing *Calder* and *Keeton*); Koenig, *supra*, at 821–23 (same); Carrasquillo, *supra*, at 926–27, 930 (discussing *Calder*).

enables the plaintiff to *add* the principal to the case *in addition to* the agent.[24]

Harron's position showcases the illogical conflicts between the outcome under the fiduciary shield and the outcome under substantive law, where agency status does not operate as a shield. Instead, "[a]n agent is subject to liability to a third party harmed by the agent's tortious conduct." Restatement (Third) of Agency § 7.01 (Am. Law Inst. 2006). "Unless an applicable statute provides otherwise, an actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment." *Id.* The actor's status as an agent instead provides a potential avenue to hold the principal liable in addition to the agent under principles of attribution. *See Verrastro v. Bayhospitalists, LLC*, --- A.3d ---, 2019 WL 1510458, at *2 (Del. Apr. 8, 2019) (discussing *respondeat superior*); *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57–58 (Del. 1997) (same). "It is consistent with encouraging responsible conduct by individuals to impose individual liability on an agent for the agent's torts although the agent's conduct may also subject the principal to liability." Restatement (Third) of Agency § 7.01 cmt. b (Am. Law Inst. 2006). Permitting an agent to use their status as a jurisdictional defense would create a needless discontinuity between jurisdictional principles and substantive law.

---

[24] *See, e.g.*, *Sternberg v. O'Neil*, 550 A.2d 1105, 1125 & n.45 (Del. 1988) (explaining agency theory and authorizing jurisdiction over parent corporation in addition to subsidiary), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016); *see also Hollinger, Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 374 n.40 (Del. Ch. 2004) (analogizing to agency theory for purposes of extending analysis under 8 *Del. C.* § 271 from subsidiary to parent).

This court previously rejected an agency-shield argument as a basis for defeating jurisdiction under the Delaware Long-Arm Statute. *See Sample v. Morgan*, 935 A.2d 1046, 1058–60 (Del. Ch. 2007). The plaintiff in *Sample* sued a lawyer and his law firm for aiding and abetting breaches of duty by senior officers and directors of a Delaware corporation. As part of the events giving rise to the underlying claims, the lawyer and his law firm caused a certificate of amendment to be filed with the Delaware Secretary of State, providing a Delaware nexus for the assertion of jurisdiction. But the lawyer and his law firm argued that the court could not consider this contact because they acted as agents for the corporation when making the filing. *Id.* at 1058–59. This court rejected their argument:

> When well-pled facts support the inference that a person caused a corporation to take jurisdictionally-significant conduct in Delaware and that conduct is an element in a scheme by corporate fiduciaries to unfairly advantage themselves at the expense of a Delaware corporation and its stockholders, our case law has consistently held that the long-arm statute may be used to serve the person. It would be surprising were it otherwise, because a contrary ruling would turn the very essence of faithless conduct—the abuse of corporate power—into an immunity from accountability, precisely because the disloyal fiduciaries derived their wrongful gains from actions of the [entity] itself, albeit . . . actions that their own conduct brought about. Such an accountability-destroying reading of the long-arm statue would itself be entirely disloyal to the statute's purpose . . . .[25]

This same reasoning applies to Harron's agency-shield argument under Section 18-109(a)(ii). When a defendant engages in jurisdictionally significant conduct under Section 18-109(a)(ii), *i.e.*, participating materially in the management of the LLC, and when that

---

[25] *Id.* at 1060 (citations omitted); *see Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*, 833 F. Supp. 437, 442–43 (D. Del. 1993) (surveying Delaware law and declining to recognize fiduciary shield as a basis for avoiding jurisdiction).

conduct supports a claim for which a defendant can be served under the statute, then the statute can be used to serve that person, even if the person acted as an agent of the LLC or its formal manager when engaging in the conduct. Were it otherwise, then the "very essence" of the conduct covered by Section 18-109(a)(ii)—participating materially in the management of the LLC—would become an immunity from accountability, an outcome "entirely disloyal to the statute's purpose."

The two possible interpretations of the agency shield argument thus offer little (if anything) to recommend them and many reasons to reject them. This decision rejects the agency shield.

## B.     Due Process

Once a plaintiff has identified a valid method of serving process, the court must assess whether the exercise of personal jurisdiction comports with due process. "The focus of this inquiry is whether [the defendant] engaged in sufficient minimum contacts with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice." *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (internal quotation marks omitted). In addition to the defendant's contacts with the state, relevant factors include "the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief . . . ; [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies . . . ." *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 220 (Del. 1982) (citations omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

53

Harron was a founding member of both International and LATAM, spearheaded the formation of those entities under the laws of this State, and accepted the role of president with each. His active participation in the formation of the two Delaware entities is a sufficient contact to enable this court to adjudicate Harron's rights and obligations under their governing agreements. *See Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2017 WL 3575712, at \*10–11 (Del. Ch. Aug. 18, 2017), *aff'd*, 184 A.3d 1290 (Del. 2018) (ORDER). Having engaged in conduct that involved the formation of a Delaware entity, Harron should have "reasonably anticipated . . . that his . . . actions might result in the forum state exercising personal jurisdiction over him in order to adjudicate disputes arising from those actions." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 50–51 (Del. Ch. 1991); *accord Hamilton P'rs v. Englard*, 11 A.3d 1180, 1198–99 (Del. Ch. 2010). Harron's service as a senior officer of the Companies is likewise a sufficient tie to subject him to jurisdiction in this state for purposes of adjudicating claims relating to his duties and obligations in that capacity. *PT China*, 2010 WL 761145, at \*5; *Assist Stock Mgmt. L.L.C. v. Rosheim*, 753 A.2d 974, 980–81 (Del. Ch. 2000); *see Del. Prof'l Ins. Co. v. Hajjar*, 55 F. Supp. 3d 537, 542 (D. Del. 2014) ("As a director of two Delaware corporations, [the defendant] purposefully availed himself of the privilege of conducting activities in Delaware so as to reasonably anticipate being haled into court here.").

Another factor in the constitutional analysis is the forum state's interest in the dispute. Delaware has a "significant and substantial interest in actively overseeing the conduct of" persons who manage Delaware entities. *Armstrong v. Pomerance*, 423 A.2d 174, 177 (Del. 1980) (discussing corporate directors). This interest "far outweighs any

burden" to a defendant who "voluntarily associated" himself with an entity by accepting a position as a senior officer. *See id.* This is particularly so where, as here, Harron is an international executive who, although based in Chicago, regularly does business in Latin America and Brazil. Litigating in Delaware is a relatively inconsequential burden that Delaware's interest far outweighs. *See Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at \*13 (Del. Ch. Mar. 31, 2003).

Two additional factors—the plaintiffs' interest in obtaining convenient and effective relief and the interstate judicial system's interest in obtaining the most efficient resolution of controversies—similarly support the reasonableness of this court's exercise of personal jurisdiction over Harron. The plaintiffs are Delaware entities. As citizens of this State, they have an interest in using its courts to recover for the injuries they claim to have suffered. In cases involving claims against persons who manage the business and affairs of Delaware entities, jurisdictional statutes like Sections 3114 and 18-109 make Delaware uniquely able to provide a convenient and effective forum. Cases involving the internal affairs of Delaware entities implicate questions of Delaware law, and for those issues litigating in Delaware provides the additional benefit of a direct appeal from the trial court to the Delaware Supreme Court, which is the only tribunal capable of providing a definitive ruling as to an issue of Delaware law. *Cf. In re Topps Co. S'holders Litig.*, 924 A.2d 951, 954 (Del. Ch. 2007) (observing during course of *forum non conveniens* analysis that litigating in Delaware would "provide litigants the timely opportunity to seek review from this state's highest court, the Delaware Supreme Court," which "is obviously unavailable in the courts of another state"). These advantages benefit all of the parties, not

55

only the plaintiffs, and serve the interstate judicial system's interest in the efficient resolution of controversies.

The one claim that does not fit neatly into this analysis is Count IV, which asserts that Harron violated federal law as set forth in the Stored Communications Act by using Metro's email servers and computer systems for unauthorized purposes and by attempting to delete emails and files from his Metro accounts before his departure. It seems unlikely that a Delaware court would exercise personal jurisdiction over Harron for this claim standing alone. In this case, however, Count IV is sufficiently related to the claims for which personal jurisdiction exists to render proper the assertion of personal jurisdiction over Harron for Counts IV.

"Once a defendant is subject to personal jurisdiction under 6 *Del. C.* § 18-109(a) as to certain claims, the Court may exercise personal jurisdiction over the defendant with respect to any claims that are sufficiently related to the cause of action." *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *11 (Del. Super. Apr. 24, 2018). "Sufficiently related claims are those predicated on the same set of facts." *Id.* That test is met here. The federal claim under the Stored Communications Act arises out of Harron's allegedly wrongful efforts to pursue and subsequently hide his personal ventures, which provide the crux for the other claims in this action. Because this court can exercise personal jurisdiction over Harron for purposes of the Counts I–III, V, and VI, this court also can exercise personal jurisdiction over Harron for purposes of the related claim in Count IV.

The other claim with a twist is Count VII. That count seeks a declaration that Harron defaulted on loans that the Companies extended pursuant to their LLC agreements so that

56

Harron could meet capital calls, with the consequence that Harron now must repay the loans when the Companies exercise their contractual right to repurchase his member interests. Normally this court would not exercise personal jurisdiction over a defendant who lacked any ties with Delaware other than his status as an officer of an entity for purposes of a garden-variety breach of contract claim, such as a claim to recover a loan. Here, it is possible that this court could exercise personal jurisdiction over Harron under the Delaware Long-Arm Statute without offending due process, because the loan claims implicate Harron's obligations as a member under the International and LATAM Agreements, and Harron was personally involved in creating those entities and preparing their LLC agreements. *See Terramar*, 2017 WL 3575712, at \*10–11. But this decision need not dilate on that point, because the claim to recover the loans is closely related to Harron's departure from the Companies and the plaintiffs' claims regarding his wrongful acts. As with Count IV, because this court can exercise personal jurisdiction over Harron for Counts I–III, V, and VI, this court also can exercise personal jurisdiction over Harron for the related claim in Count VII.

## III.     CONCLUSION

Harron is subject to personal jurisdiction in Delaware for purposes of the claims asserted in this case. His motion to dismiss this action pursuant to Rule 12(b)(2) is denied.